IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

SYLVIA FAYE BOOKER                                                              PLAINTIFF

VERSUS                                          CIVIL ACTION NO. 1:03cv791WJG-JMR

NORTHROP GRUMMAN SHIP
SYSTEMS, INC., *ET AL.*                                                       DEFENDANTS

MEMORANDUM OPINION

This cause is before the Court on the motion for summary judgment [54] filed by the Defendant, Northrop Grumman Ship Systems, hereafter, Northop Grumman. After due consideration of the evidence of record, the parties' briefs, and the applicable law, and being otherwise fully advised in the premises, the Court finds as follows.

Sylvia Booker worked as a storekeeper for Northop Grumman for approximately 29 years until she was terminated on April 9, 2003. She filed the instant lawsuit on October 6, 2003, alleging that she was subjected to verbal and physical harassment during the latter years of her employment because she was a black female. (Ct. R., Doc. 1, p. 3.) Booker has asserted claims of racial harassment and retaliation pursuant to 42 U.S.C.A. § 1981, as well as a state law claims of negligent hiring, retention, supervision, and training, negligent and intentional infliction of emotional distress, and assault and battery. (*Id*., pp. 10-15.)

Background

Before proceeding with its discussion of the factual basis of Booker's claims, the Court is compelled to note that Booker suffers from major depressive disorder with psychotic episodes, a

condition which, as conceded by her attorney, has affected her ability to recall the exact details of the alleged harassment.  It has also been conceded that Booker has a history of abusing prescription pain medications.  (Ct. R., Doc. 57, p. 1-2.)  Sadly, the record herein reveals that Booker is, in words of her own psychiatrist and expert witness, "quite . . . psychiatrically ill."  She apparently suffers from auditory hallucinations, as well as paranoid ideations.  (Ct. R., Doc. 54, Exh. 19, p. 56.)  As a result of the foregoing, the factual basis of her claims is not easily tracked.

I.

The first incidents of harassment are alleged to have occurred in April of 2001, when Booker had been working for Northop Grumman approximately 27 years.  The complaint alleges that:  (1) three white Northrop Grumman employees verbally harassed Booker using "harsh, indecent, and racist language" including calling her a "black arrogant bitch;" (2) three nooses were discovered hanging in and around her workplace; and (3) a black doll with a missing arm was left on the seat of her car accompanied by a note stating, "Bitch, next time this will be you."  (Ct. R., Doc. 1, ¶¶ 7-8.)

Following these events, Booker alleges that she was transferred to an isolated work area over her objection where she was verbally harassed and eventually raped by a supervisor, Tom McKnight.  (*Id*., ¶ 11.)  In her deposition, Booker testified that McKnight also exposed himself to her, tore her clothes off on at least three occasions, and put his hands on her breasts and between her legs an estimated 15 times.  (Ct. R., Doc. 54, Exh. 16, pp. 30, 40-41.)  According to Booker, she screamed and made threats when this occurred, but no one came to assist her.  (*Id*., Exh. 16 p. 30.)

In December of 2001, following the alleged rape by McKnight, Booker checked herself into a drug rehabilitation program at Gulf Oaks Hospital. (Ct. R., Doc. 1, ¶ 13; Ct. R., Doc. 54, Exh. 7.) She explained during her deposition that she felt she was taking too many pain medications – up to 10 Lortabs a day. (Ct. R., Doc. 54, Exh. 16, p. 20.) According to Booker, she had the Lortabs in her medicine cabinet for many months, but only became addicted when the harassment at Northrop Grumman began. (*Id.*, Exh. 16, p. 21.) Prior to that time, she testified, she took Lortab only "every now and then" for pain associated with carpal tunnel syndrome. (*Id.*, Exh. 16, p. 21.)

Following her participation in the Gulf Oaks substance abuse program, Booker alleges that she returned to work and was thereafter transferred to a new area of the shipyard where her co-workers told vulgar sexual and racial jokes in her presence and physically harassed her by pulling down her pants, placing their hands in her pants, snapping her bra, caressing her breasts, pinching her nipples, and tampering with her food. (Ct. R., Doc. 1, ¶ 14.) She states that her co-employees also made comments about her body parts, particularly her buttocks because she was a black female and one employee asked her if it was true she had an "itchy p—y." (*Id.*) During her deposition, Booker also testified that coworkers told her that she "wouldn't look at a black man no more once they did this and that" to her. (Ct. R., Doc. 57, Exh. 1, p. 94.)

Booker identified four men who allegedly harassed her during this time: David Robertson, Bud Beckham, Willie Williams, and a man named Ike. (Ct. R., Doc. 54, Exh. 16, pp. 147-148.) Booker states that Ike propositioned her and offered her money for sex and that Willie Williams offered her Lortabs for sex. (*Id.*, Exh. 16, pp. 147-148.) David Robertson, who is named individually as a defendant in this case, is alleged to have committed the following acts of

harassment: (1) stuck his penis in Booker's yogurt on two occasions and inserted his penis in her mouth; (2) reached into Booker's shirt and lifted her breast into his mouth; (3) attempted to have Booker view pornography during work; (4) repeatedly told her that he was attracted to black women, especially their behinds; (5) licked the genital area of a photograph of a famous black actress in Booker's presence; and (6) often used the racial slur "nigger" during the times he worked with Booker. (*Id*.) Booker alleges that her immediate supervisor, Albert Goss, witnessed some of this harassment but took no action. (*Id.*, ¶ 15.) According to Booker, Robertson had a history of propositioning black females and previously lost a supervisory position due to racist remarks.[1] (*Id.,* ¶ 14.)

Booker alleges that she requested a transfer from her second-level supervisor, Joel Watford, but Watford denied her request stating that he wanted her to be miserable. (*Id*., ¶ 16.) She also claims that she reported the harassment to Watford's supervisor, the director of labor relations, human resources personnel, and Northrop Grumman's employee hotline, but there was no investigation or remedial action. (*Id*., ¶ 17.)

In January 2003, Booker alleges that Robertson, pretending to be a manager, called her at home and asked her to come into work to fix a computer. (*Id*., ¶ 18.) When she arrived, however, the computer was working properly. (*Id.*) As she was leaving, Booker claims that several Northrop Grumman employees grabbed her from behind, pulled her arms back, and tried to tear her clothes off, stating "bitch, we are going to teach you a lesson." (*Id.*) It is alleged that

---

[1] While Booker alleges that Robertson had history of propositioning black females and previously lost a supervisory position due to racist remarks, the Court was unable to find any competent evidence to support the allegation. The only related evidence is Booker's deposition testimony that Robertson previously harassed "several girls" – one of whom was named Michelle. (See Ct. R., Doc. 60, Exh. 1, p. 87.)

the employees ran away upon hearing footsteps approaching the area, taking Booker's bag which contained a journal wherein she had written detailed descriptions of the harassment she suffered at Northrop Grumman.  (*Id*.)  Booker states that she attempted to report this assault to Dorothy Shaw, Director of Organization and Planning, but Shaw merely advised her to contact the director of human relations.  (*Id*., ¶ 19.)  The director of human relations, Booker states, never returned her calls.  (*Id*.)

According to Booker, the above-described harassment caused her to suffer major depression and post-traumatic stress disorder affecting her ability to sleep, eat and socialize.  (*Id.*, ¶¶ 20-21.)  As a result, Booker states that she took prescription medications, some of which made her drowsy in the mornings.  (*Id.*, ¶ 22.)  Because of this drowsiness, Booker alleges, she requested an adjustment to her schedule and, thereafter, a transfer to a busier work area, but her requests were denied.  (*Id.*, ¶¶ 23-23.)

At some point, Booker alleges, the same employees who had been harassing her began falsely reporting that she was sleeping on the job.  (*Id*., ¶ 24; Ct., R., Doc. 54, Exh. 16, p. 17.)  As a result, Booker states that she was subjected to a drug test and later advised that she tested positive for a forbidden substance.  According to Booker, she was never given written confirmation of the test results, an opportunity to examine the test materials, or an opportunity to demonstrate that she had prescriptions for the medications she was taking.  (*Id*.)  Moreover, she claims, the employees who reported her for sleeping routinely smoked marijuana on the job but were never tested for drugs.  (*Id*.)

According to Booker, she agreed to attend the Stevens Center, a substance abuse treatment facility, with pay while Northrop Grumman investigated her allegations of harassment.

-5-

(*Id*., ¶ 26.)  She claims, however, that she was wrongly accused of fighting at the Center and forced to leave after approximately 18 days.  (*Id*., ¶ 27.)  She relates that just before she took medical leave and after she was discharged from the Stevens Center, employees from Northrop Grumman drove into her driveway at home, brightening their lights and revving their engines, and would peel out when Booker or her son looked out the window.  (*Id*., ¶ 30.)

On April 9, 2003, Booker's employment was terminated, allegedly without notice from Northrop Grumman.  (*Id*., ¶ 29.)  Booker states that Northrop Grumman has refused to pay her for her medical leave as promised, and while it has offered to re-hire her, Northrop Grumman is insisting that she complete a treatment program, release all of her medical records, and obtain a full release to work from her psychiatrist.  (*Id*., ¶ 32.)

As her final allegation of harassment, Booker states that every bathroom she ever used at Northrop Grumman up until her last day of employment has had racial graffiti on the stalls or walls.  (*Id.,* ¶ 34.)

II.

In response to the foregoing allegations, Northrop Grumman submits that Booker's abuse of prescription narcotics has left her psychotic, delusional and paranoid and that her claims of sexual abuse and harassment are simply not based in reality.  (Ct. R., Doc. 55, p. 1.)  Of all of Booker's claims, Northrop Grumman states that only the allegation concerning the nooses has a factual basis.  Northrop Grumman concedes that in 2001, several nooses were found in Booker's work area.  (*Id.,* p. 3.)  It states, however, that it responded immediately by identifying the person responsible and allowing him to resign under threat of termination.  (*Id.*)  While the official reason for the employee's *de facto* termination was un-excused absences, Northrop Grumman's

internal documents show that the termination was linked to the noose incidents. (*See* Ct. R., Doc. 54, Exhs. 8 & 9.) The rest of Booker's allegations, Northrop Grumman contends, are either the product of her drug-induced psychosis or fabrications she invented after her discharge. (Ct., R., Doc. 55, p. 3.)

According to the records of Booker's admission to Gulf Oaks Hospital in 2001, she had been abusing pain medication for approximately three years and was, at the time of her admission, taking up to seventeen Lortabs a day. (Ct. R., Doc. 54, Exh. 7.) Her supervisor at Northrop Grumman, Albert Goss, testified that he received verbal complaints about Booker from her coworkers and he personally witnessed her sleeping on the job several times. (*Id.,* Exh. 18, p. 92.) Lula Stewart, Booker's union steward, testified that she witnessed Booker sleeping on the job six or seven times and that she also received complaints from other employees that Booker was sleeping on the job. (*Id.,* Exh. 22, p. 48, 56.) Both Goss and Stewart testified that they and other Northrop Grumman employees tried to cover for Booker and protect her but her situation ultimately deteriorated to the point that they feared for her safety and the safety of other employees. (Exh. 22, p. 50, 67; Exh. 18, p. 93.)

In October of 2002, Booker was referred to Northrop Grumman's on-site physician, Dr. Warfield. (*Id.,* Exh. 10.) Thereafter, it was determined that Booker would take a leave of absence and see her own physician to resolve the issues that were causing her to sleep on the job. (*Id.,* Exh. 22, p. 43, 60-62.) According to Stewart, however, when Booker returned from her leave of absence, she once again began sleeping at work. (*Id.,* Exh. 22, p. 64-66.) Booker was ultimately tested for drugs and tested positive for using prescription drugs. (*Id.,* Exh. 20, p. 69.)

On January 28, 2003, Booker signed a document acknowledging that she was addicted to drugs and that she would not be allowed to return to work without satisfactory completion of an approved treatment program. (*Id.*, Exh. 12.) The document also included an acknowledgment that medical leave could last no longer than 10 weeks. (*Id.*) While Booker admits to signing this document, she testified during her deposition that she did not read it and could not remember whether its terms were explained to her. (*Id.,* Exh. 16, p. 64-65.) In any event, Booker denies that she was advised that she had to complete a treatment program in order to return to work. (*Id.*)

In March of 2003, Booker checked into the Stevens Center; however, after less than three weeks, she was dismissed from the program. According to a representative of the Stevens Center, Booker was discharged after she engaged in a verbal altercation with the residential manager which escalated into physical contact. (*Id.*, Exh. 21.)

According to Northrop Grumman, Booker did not obtain treatment at another facility or otherwise complete an approved treatment program, and therefore, she was automatically terminated on April 9, 2003, at the expiration of 10 weeks of medical leave. (Ct. R., Doc. 55, p. 6.) When Booker filed a grievance to be reinstated, Northrop Grumman agreed to reinstate her without back pay on condition of completion of a treatment program. (*Id.*, p. 7; Ct. R., Doc. 54, Exh. 15.) Booker apparently rejected this offer, however. Northrop Grumman also states that it agreed to arbitrate the issue of back-pay pursuant to its collective bargaining agreement but that Booker again refused, filing this lawsuit instead. (Ct. R., Doc. 55, p. 7.)

III.

A review of the summary judgment record reveals a number of inconsistencies in and between the allegations in Booker's complaint, her deposition testimony, her pleadings and the documentary evidence submitted by both parties.  In her complaint, for example, Booker alleges that she was raped by Tom McKnight. (Ct. R., Doc. 1, ¶ 11.)  During her deposition, however, she testified that she was able to fight McKnight off, so he never actually succeeded in having sex with her.  (Ct. R., Doc. 54, Exh. 16, pp. 41-42.)  It is also alleged in the complaint that Booker did not report the alleged rape by McKnight because he threatened to fire her brother and told her that no one would believe her because he was a supervisor and his uncle was a company vice president.  (Ct. R., Doc. 1, ¶ 12.)  During her deposition, however, Booker testified that she *did* complain about McKnight – specifically, that she made two calls to the Northrop Grumman employee hotline.  (Ct. R., Doc. 54, Exh. 16, p., 35.)  She testified, further, that she did not complain to labor relations because she had gotten no satisfaction from the complaint concerning the noose incidents.  (*Id.,* Exh. 13, p. 35.)

With regard to the nooses, it is alleged in the complaint that Northrop Grumman took several months to discover who hung the nooses despite the fact that Booker provided the names of the men who harassed her to her local union representative and to human resources personnel.  (Ct. R., Doc. 1, ¶ 9.)   During her deposition, however, Booker contradicted this allegation, stating that she never knew the names of the persons who allegedly harassed her in 2001.  (Ct. R., Doc. 54, Exh. 16, pp. 124-125.)  The complaint also states that Booker continued to see the employee who was supposedly terminated for leaving the nooses.  (Ct. R., Doc. 1, ¶ 9.)  Booker

testified during her deposition, however, that she never saw that person again after he was fired. (Ct. R., Doc. 54, Exh. 16, p. 143.)

With regard to the alleged harassment by Robertson, the complaint states that Robertson put his penis in her yogurt on two occasions; however, Booker testified that it happened only once. (*Id.,* p. 192.)  The complaint also states that Robertson "often" used the racial slur, "nigger," during the times he worked with Booker; yet, Booker testified that she heard Robertson use that word on only two occasions.  (Ct. R., Doc. 58, Exh. 2, p. 157.)  Once, Robertson allegedly referred to a coworker, Willie Williams, as a "stupid nigger" in Booker's presence.  All that is known of the circumstances surrounding the second instance is that Robertson used the "N" word in front of Booker and Bud Beckham.  (*Id*.)

The Court also notes that Booker's complaint contains no allegations of rape by Robertson.  Booker stated during her deposition, however, that Robertson pulled her pants and underpants down to her ankles, fondled her, groped her, and massaged her breasts.  (Ct. R., Doc. 54, Exh. 16, p. 206-207.)  She also claimed that Robertson penetrated her – although she was unable to state what he used to penetrate her – stating that it could have been his penis, fingers or tongue.  (*Id.*, Exh. 16, p. 207.)

According to Booker, two co-workers – Bud Beckham and Joey Stevens – witnessed the incident wherein Robertson is alleged to have put his penis in Booker's yogurt and, thereafter, her mouth, as well as the incident wherein Robertson allegedly penetrated her.  (*Id.*, p. 210.)  Both men, however, have offered affidavits stating that they never saw any employee make sexual advances to Booker or sexually harass her in any way.  (Ct. R., Doc. 54, Exh. 24 & 30.)  Booker's supervisor, Albert Goss, is alleged to have witnessed Robertson pulling her bra down

and putting her breast in his mouth.  (*Id.,* Exh. 16, p. 107.)  Goss, however, testified that he never witnessed any of the harassment alleged by Booker.  (Ct. R., Doc. 54, Exh. 17, pp. 84-85.)

Booker testified that she advised her union representative, Lula Stewart, about the yogurt incident and also complained to her about the other harassments from Robertson.  (*Id.,* Exh. 16, pp. 109-111, 198).  Later in her deposition, however, she stated that she never complained to Stewart about anything because she and Stewart did not have a good relationship.  (*Id.,* Exh. 16, p. 229.)  Booker likewise testified that she complained to Goss about the alleged harassment and told him that Robertson raped her because she was a black female.  (*Id.*, p. 210.)  Goss denies receiving any complaint of harassment from Booker.  (Ct. R., Doc. 54, Exh. 17, p. 71.)

Booker also claims to have reported the various acts of harassment to numerous Northrop Grumman representatives including Thomas Stallworth, Dorothy Shaw, Joel Watford, and Jimmy Williams.  (Ct. R., Doc. 1, ¶¶ 16-17.)  Thomas Stallworth has offered his affidavit that he never heard any allegation that a Northrop Grumman employee had sexually harassed Booker until after she was fired.  (Ct. R., Doc. 54, Exh. 29.)  Similarly, Dorothy Shaw states that she was not aware of any allegations of sexual harassment until after Booker was terminated.  (Ct. R., Doc. 60, Exh. 3.)

Booker testified during her deposition that she began seeing a psychiatrist, Dr. Paul Pyles in December 2001, and continued to see him in 2002.  (Ct. R., Doc. 54, Exh. 16, p. 44.)  She states that when she was in the hospital at Gulf Oaks, she advised Pyles of what had been happening at the shipyard that year and, during 2002, she continued to advise him of her harassment at work.  (*Id.,* pp. 44-45, 116.)  According to Dr. Pyles' testimony, however, Booker did not claim to have been raped or sexually harassed at the shipyard during the course of her

-11-

hospitalization at Gulf Oaks in 2001. (*Id.,* Exh. 19, p. 71.) Rather, she disclosed to hospital personnel that she had been raped twice as an adult by her brothers-in-law. (*Id.,* Exh. 19, pp. 68-69.) Also, rather than stating that she had been harassed at work, Booker complained of "relational problems[] with [her] kids," problems managing her household, and "anxiety at work from home problems." (*Id.,* Exh. 19, p. 69.) Pyles also testified that he did not see Booker at all between December 2001 and 2003. (*Id.,* Exh. 19, p. 10.) Finally, he stated that allegations of harassment at the shipyard are not reflected in his records until April of 2003 – the month Booker was terminated. At this time, Pyles states, Booker advised him that a noose had been hung over her desk and males had unhooked her bra, stuck their hands in her pants, and put their penises in her food. Later, Booker told him that she was raped at work in January of 2003. (*Id.,* Exh. 19, pp. 10-12.)

  Booker claims that the workplace harassment she suffered at Northrop Grumman caused her problems with depression and drug abuse. (Ct. R., Doc. 1, ¶ 20; Ct. R., Doc. 57, p. 2.) She testified similarly during her deposition that she only became addicted to pain medication when the harassment at Northrop Grumman began. (Ct. R., Doc. 54, Exh. 16, p. 21.) Prior to that time, she testified, she only took the medication "every now and then" for pain associated with carpal tunnel syndrome. (*Id.,* Exh. 16, p. 21.) Records from her admission to Gulf Oaks, however, reveal that by 2001, Booker had been depressed and abusing pain medication for three years. (*Id.,* Exh. 7; Exh. 16, pp. 65-66, 70-71).) Booker also testified that she has had no problems with drug abuse since her hospitalization at Gulf Oaks in 2001. (*Id.,* Exh., 16, pp. 14-17.) Upon her admission to the Stevens Center in January of 2003, however, Booker related that she continued to take Lortab and Valium. (*Id.,* Exh. 13.)

As for the assault which allegedly occurred in January 2003, Booker's testimony was significantly different from the allegations in her complaint. In her pleadings, Booker alleged the following:

> In January 2003, Defendant Robertson pretended to be a manager and called the Plaintiff into work to fix a computer. When the Plaintiff came into work and examined the computer it operated properly. As she was leaving the area, several employees grabbed her from behind, pulled her arms back and tried to tear off her clothes. One of these employees said "bitch, we are going to teach you a lesson." One employee stated that she must not have gotten the message before. One employee sounded like one of the white males that harassed her around the time of the noose incident. The employees took the Plaintiff's bag, which contained a journal in which she had written detailed descriptions of the harassment she suffered. One of the employees stated that the Plaintiff had been writing down what we have done. When the employees heard someone walking towards this area they ran and took the journal.

(Ct. R., Doc. 1, ¶ 19.) During her deposition, however, Booker denied that Robertson pretended to be a manager and, instead, stated that he identified himself. (Ct. R., Doc. 60, Exh. 1, p. 212.) She also denied that the man or men who allegedly assaulted her took her bag. (*Id.,* Exh. 1, p. 223.) Further, although she testified that her journal turned up missing over the Christmas break, she denied having taken it to work with her on the day of the alleged assault. (*Id.*) She also denied hearing one of the men state with regard to her journal, that she had been writing down what they had done. (*Id.,* Exh. 1, pp. 223-224.) Finally, contrary to her allegation that the journal chronicled her abuse at the shipyard, Booker testified that her journal contained information about her life and family and was "not about the shipyard." (Ct., R., Doc. 54, Exh. 16, p. 222).

<u>Summary Judgment</u>

In the motion now before the Court, Northop Grumman and Robertson seek summary judgment on all of Bookers claims. (Ct. R., Doc. 54.) "Summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just speedy and inexpensive determination of every action.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 327, 1006 S.Ct. 2548, 2555 (1986) (citations omitted). A district court may properly grant a motion for summary judgment when, after viewing the facts in the light most favorable to the nonmoving party, "[t]he pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c), *Deas v. River West, L.P.,* 152 F.3d 471, 475 (5th Cir. 1998). Stated differently, summary judgment must be entered against a nonmoving party if that party fails to make a showing sufficient to establish the existence of a genuine issue of fact essential to that party's case. *Celotex*, 477 U.S. at 322-323. Generally speaking, summary judgment is not favored in employment discrimination claims; however, it is proper where "there is no genuine issue as to any material fact . . . the moving party is entitled to judgment as a matter of law." *Waggoner v. City of Garland, Tex.,* 987 F.2d 1160, 1164 (5th Cir. 1993) (quoting FED. R. CIV. P. 56(c).

The Court will first address the propriety of summary judgment as it relates to Booker's two federal claims as they form the basis of this Court's jurisdiction.

Racial Harassment and Retaliation Under Section 1981

In Count I of her complaint, Booker asserts that she was subjected to racial harassment in violation of 42 U.S.C.A. § 1981. The requirements for a racial harassment claim under section 1981 are identical to those under Title VII. The plaintiff must prove (1) that she belongs to a protected group; (2) that she was subjected to unwelcome harassment; (3) that the harassment complained of was based on race; (4) that the harassment complained of affected a term, condition or privilege of employment; and (5) that her employer knew or should have known of the harassment and failed to take prompt remedial action. *Felton v. Polles,* 315 F.3d 470, 484 (5th Cir. 2002) (quoting *Celestine v. Petroleos de Venezuella SA,* 266 F.3d 343, 353 (5th Cir.2001)). "[W]here the harassment is allegedly committed by a supervisor with immediate (or successively higher) authority over the harassment victim, the plaintiff employee needs to satisfy only the first four of the elements listed above." *Id.* (quoting *Celestine*, 266 F.3d at 353).

To be actionable, the "harassment must involve 'racially discriminatory intimidation, ridicule and insults'" *Id.* (citing *Walker v. Thompson*, 214 F.3d 615, 625 (5th Cir.2000); *Harris v. Forklift Systems, Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)). "[I]t must have also affected a term, condition, or privilege of employment" meaning, "it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* (quoting *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002) (in turn quoting *Harris*, 510 U.S. at 21, 114 S.Ct. 367 (1993)) (internal quotation marks omitted).

To succeed on her retaliation claim, Booker must demonstrate the following: (1) that she engaged in a protected activity, (2) that she he was subjected to an adverse employment action;

-15-

and (3) a causal link between the protected activity and the adverse employment action.  *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 319 (5th Cir. 2004) (citing *Banks v. E. Baton Rouge Parish Sch. Bd.,* 320 F.3d 570, 575 (5th Cir.2003); *Foley v. Univ. of Houston Sys.,* 324 F.3d 310, 316 (5th Cir.2003)).  If Booker succeeds in establishing a *prima facie* case of retaliation, the burden shifts to the Defendant to proffer a legitimate reason for the underlying the employment action.  *Id*.  (citing *Aldrup v. Caldera,* 274 F.3d 282, 286 (5th Cir.2001)).  "If the defendant makes this showing, the burden shifts back to the plaintiff to demonstrate that the employer's articulated reason for the employment action was a pretext for retaliation."  *Id.*

  The Defendants seek to attack Booker's claims from several angles.  First, they argue that Booker's complaint should be dismissed in its entirety because her allegations and testimony are so unbelievable that no reasonable juror could credit them.  (Ct. R., Doc. 55, p. 9-18.)  The Defendants submit that Booker's claims are merely the delusional projections of woman who has abused narcotics for a number of years.  (*Id*., p. 21.)  Not only are her claims refuted by all other witnesses, the Defendants argue, but her tale is so bizarre and so fraught with contradictions, that no reasonable person could credit her claims.  (*Id*.)

  The Defendants concede that credibility determinations are ordinarily reserved for the jury.  (*Id*., p. 8.)  Citing case law from the Seventh Circuit, however, the Defendants assert that the Court may properly reject Bookers claims.  "Even when the party's testimony does not go so far as to defy the laws of nature, if the story is 'so internally inconsistent or implausible on its face that a reasonable fact finder would not credit it . . . the testimony can and should be rejected without a trial.'"  (*Id*.) (citing *Seshardri v. Kasraian*, 130 F.3d 798,802 (7th Cir. 1997)).

The logic of *Seshardri* was recently applied by the United States District Court for the Southern District of Texas in *White v. Omega Protein Corp.*, 390 F. Supp.2d 604 (S.D. Tex. 2005). In *White*, an ADEA plaintiff claimed that he was told by his employer when he was fired that he was "tired and old." *Id*. at 5. The court, however, found that the plaintiff failed to adequately show direct evidence of age discrimination noting that the plaintiff failed to raise the "tired and old" accusation until 18 months after his termination, failed to include it in a memorandum documenting the conversation in question written five days following his termination, failed to include it in his EEOC charge or in his original, first and second complaints, and finally, that the accusation mirrored allegations contained in a case relied on by the plaintiff. Relying on *Seshardri*, the court reasoned that while it must "construe all facts in favor of the plaintiff, it is not required to accept as true a statement that no reasonable person would believe." *Id*.

Prior cases from this circuit have also recognized, at least in theory, that evidence may be rejected by the court which is "in its nature too incredible to be accepted by reasonable minds." *See Whitaker v. Coleman*, 115 F.2d 305, 306 (5th Cir. 1940) ("To proceed to summary judgment it is not sufficient then that the judge may not credit testimony proffered on a tendered issue. It must appear that there is no substantial evidence on it, that is, either that the tendered evidence is in its nature too incredible to be accepted by reasonable minds, or that conceding its truth, it is without legal probative force."); *see also Thibodaux v. Atlantic Richfield Co.*, 580 F.2d 841, 844 (5th Cir. 1978).

Having given this matter considerable thought, the Court finds that summary judgment must be awarded on the Plaintiff's 1981 claims. Implicit in the law of summary judgment is the

requirement that the evidence adduced by the non-moving party be of such quality or character as to permit a *reasonable* jury to find in its favor. *See, e.g., Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986) ("[S]ummary judgment will not lie . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."); *Monsanto Co. v. Spray-Rite Service Corp.,* 465 U.S. 752, 768, 104 S.Ct. 1464, 1473, 79 L.Ed.2d 775 (1984) (To survive summary judgment there must be evidence that "reasonably tends to prove" the plaintiff's case.)  Thus, in order to survive summary judgment, Booker must present sufficient evidence to enable a reasonable jury to conclude that she was subjected to harassment because of her race or, in the case of her retaliation claim, that she was terminated for complaining of the racial harassment.  The Court finds that she has not done so.  Unfortunately for the Plaintiff, her testimony is so implausible, so fraught with inconsistencies, that no reasonable jury could credit it.

      The Court is mindful that credibility determinations are generally not appropriate at the summary judgment stage; however, "[t]he evidence offered must [at least] have the force needed to allow a jury to rely on it and the court may disregard an offer of evidence that is too incredible to be believed." Wright & Miller, Federal Practice and Procedure, 10A Fed. Prac. & Proc. Civ.3d § 2727.  As noted by Judge Richard Posner of the Seventh Circuit Court of Appeals, "Judges . . . are not wallflowers or potted plants." *Tagatz v. Marquette University,* 861 F.2d 1040, 1045 (7th Cir. 1988).  "[A] district court is not required to accept testimony that is clearly incredible or unreliable." *Cambridge Electronics Corp. v. MGA Electronics*, 227 F.R.D. 313 (CD. Cal. 2004) (citing *Tagatz v. Marquette University,* 861 F.2d at 1045)).  In the instant case, a

jury would have no way of determining which of the varying versions of events offered by the Plaintiff actually comports with the truth.

Even if the Court were to find that a jury could reasonably credit Booker's testimony, summary judgment would still be appropriate as there are insufficient factual allegations to support a finding that the harassment of which Booker complains was based on her *race*. The incidents involving the nooses and the black doll are clearly racial in nature. They occurred however, in 2001, and Northrop Grumman responded immediately by investigating the incident and firing the responsible party. Despite the allegations in her complaint that she continued to see the employee who was supposedly terminated for leaving the nooses, (Ct. R., Doc. 1, ¶ 9), Booker testified that she never saw that person again after he was fired. (Ct. R., Doc. 54, Exh. 16, p. 143.) Booker alleges in her response to Northrop Grumman's motion for summary judgment that her co-employees verbally harassed her using "harsh, indecent, and racist language" including calling her a "black arrogant bitch;" however, she fails to support this allegation with any summary judgment evidence. The remaining allegations, as set forth fully above, are overwhelmingly sexual in nature, and the law is clear that claims of sexual discrimination do not fall within the scope of section 1981. *See Runyon v. McCrary,* 427 U.S. 160, 167, 96 S.Ct. 2586, 2593, 49 L.Ed.2d 415 (1976). Booker's subjective belief that she was harassed because she was black is insufficient to create an issue of fact for trial. As for Booker's retaliation claim, the record is devoid of any evidence tending to demonstrate a nexus between Booker's termination and any protected activity on her part. Consequently, the Court finds that Booker has failed to establish a *prima facie* case of either racial harassment or retaliation under 18 U.S.C.A. § 1981.

Conclusion

For the reasons stated above, the Court finds that Northrop Grumman is entitled to summary judgment on Booker's claims of racial discrimination and retaliation under 18 U.S.C.A. § 1981. Further, finding that dismissal of Booker's section 1981 claims is appropriate, the Court declines to exercise jurisdiction over her pendant state law claims. *See Wong v. Stripling*, 881 F.2d 200, 204 (5th Cir. 1989) (stating general rule that "when the federal claims are dismissed before trial, the pendent state claims should be dismissed as well") (citing *United Mine Workers v. Gibbs,* 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966)).

A separate Final Judgment in accordance with this Memorandum Opinion shall issue this date.

THIS the 14th day of March, 2006.

*Walter J. Gex III*
UNITED STATES SENIOR DISTRICT JUDGE